Good morning. May it please the Court I'm Tom Golden here on behalf of the Luke family. I'd like to reserve five minutes for rebuttal. We are here today, Your Honor, on de novo review of two summary judgments dismissing the claims of the Luke family against the pharmacy and the pharmacist as well as the clinic and its personnel. I'd like to address the issues regarding the dismissal of the clinic first because I anticipate more questions regarding the pharmacy. One thing I need for you to address in all of this and I'm going to ask both sides about it but there were supplemental declarations of Ms. Luke's experts. It's not clear to me in the record whether the court ruled on their admissibility, Your Honor. There was an objection filed by Mr. Rasmuson, and that is part of the record, but there is no decision by the judge ruling on that objection. There is no motion brought by them. Well, they did a motion to strike, I think, didn't they? I'm not sure if they did a motion to strike, but I know that there is no decision by Judge Burgess ruling on any motion to strike or making any determination as to the sanctions under CR 36. So do we consider them or not? I believe that they're in the record and therefore they're to be considered, Your Honor. Well, let's assume from the – but the court also doesn't address those in its decision. So how do we – let's just assume for argument's sake that I thought that if those weren't considered, that you lose. But if they are considered, that you might have a triable issue in a certain area. But in order to consider them because they're late declarations, the court – you know, it's your responsibility when you submit something supplemental to show that it doesn't prejudice the other side and all of that. So – I would point – I would – But either side can ask the court – if there's obviously something the court doesn't rule on, either side, after a decision, can say, hey, you didn't rule on this particular motion, so we don't know what you decided this on. Well, it would be nice if the court said, this is what I – this is what I objected to. But the court does not even have to say that in their decision, what they reviewed. They can just say denied that there is material issue of fact or granted. I would also point out, Your Honor – But it affects what we consider. Yes, it does. And I think is that there's an ambiguity here on this issue. And I would say that we, as the plaintiff, is that since there is no order striking the declarations, that there is no sanctions against the plaintiff, is that they should be at issue and be considered by this Court. I would also point out, Your Honor, is that the – that Dr. Rapkin, he was a disclosed witness. Dr. Saction was a disclosed witness. Dr. Hornbeck was a disclosed witness. And they gave declarations, very detailed declarations, which to me, independently of whether or not Dr. or Mr. Feynman, the pharmacist, toxicologist, whether or not he could testify against the clinic, I think regardless there is that there is, from all of our experts, at least material issues of fact on duty causation and damages as to the clinic. Well, just procedurally, there was – there were these – this motion for summary judgment, and then there wasn't a ruling, and then it's time for trial, and then the Court rules? Or what was the – No. No, Your Honor. There was initially a summary judgment motion brought by the pharmacy. That was granted. Then there was a motion by the clinic for summary judgment principally on causation and the informed consent issue. And then that was granted. We did not even get – we did not even get close to trial. In fact, the depositions of Dr. Rapkin, Dr. Feynman, and Dr. Hornbeck were still to be – they were scheduled and were canceled in light of Judge Burgess's dismissal of the case against the clinic.  With respect to the issue of whether there was approximate cause between the conduct of the clinic and Mrs. Luke's fulminant liver disease and the need for a complete liver transplant, I would point to the Court that Dr. Pompaselli at the excerpt Dr. Hornbeck at page 82, and again Dr. Rapkin at pages 95 and 105 of the record establish causation. Their saying is that within 12 – within two weeks of the giving of the antabuse is that there would have been, on a more likely than not basis, abnormal liver function studies in Teresa Luke. Dr. Hornbeck goes slightly further and says within 10 days. And we are saying is that the reasonable standard of care of this clinic was to take baseline liver function studies and to repeat them within two to four weeks. And in this situation, had they done that and there have been abnormal results, reasonably prudent care under that circumstance would then discontinue the antabuse and there would be no injury, further injury or damage. Now, in this case, is that through Dr. Rapkin and Dr. Saxon, is that we've – there is competent and admissible evidence there that there is a 1 in 21 out of 25,000 reported incidents of the fulminant liver failure. And we believe that the Court improperly focused on that number in assessing the risk to the patient. If you look at those declarations of Dr. Saxon and Dr. Rapkin, they are saying that one out of four patients who are administered and prescribed antabuse have abnormal liver functions. And the abnormal liver function is because of injury and death to liver cells. The difference between going from a one out of four likelihood of liver injury to death of the liver and need for transplant was there any testimony in the depositions or elsewhere about whether you stop antabuse when you find some elevation? I believe that's also contained within the records of the declaration. Dr. Pompaselli, Dr. Rapkin. Let me find that, Your Honor. Dr. Fischer – or, excuse me, Dr. Corliss, the pathologist, the treating pathologist, he said that discontinuance would have allowed the liver to regenerate and avoid the transplant. That's page 1 of this. I guess what I was getting at, though, is you say, well, one out of four people will show some elevation. And I just wonder if that means that one out of four people are told to stop using antabuse or whether they say, well, there's some elevation here, but that's very common. And it probably won't cause any big harm because only one out of 25,000 to 40,000 actually gets liver failure. I don't think the depositions got into that detail, Your Honor, but to me is that I think to a reasonable person, if they're told that there is damage to the liver ongoing and the presumption is that it is from a toxic reaction from a drug, is that you're going to try and find an alternative to the drug or stop the drug unless it is, in essence, a life-saving urine that helps in choice of you to take it or die. But Dr. Gordon, I think his testimony was that an elevated enzyme wouldn't necessarily have stopped him from continuing to administer, right, antabuse? Well, that was his testimony, but we are here at summary judgment, Your Honor. We're not here to resolve that issue. We are here to see whether or not there is material issue of fact on that question. And I submit that there is, from the record, when you talk about the declarations of Dr. Rapton, Dr. Saxon, Dr. Corliss, that it would have made a material difference if there was discontinuance of the drug. Next question, you know, is that, and this gets into that issue of material risk, is that one out of four will have injury. And I think is that that's a big difference when you're looking at an average patient and a reasonable patient, and not where you can then automatically say is that as a matter of law, one out of 25,000, that the focus must be on the actual end result. Because it would be our argument at trial is that if there is reasonably prudent medical care given, you're going to avoid that one out of 25,000. And so if you find that that wasn't the problem when it's one out of four and discontinued the drug, it's not going to persist over 12 weeks to where there then is irreversible liver failure. I'd also point out, Your Honor, is that there was an issue regarding Dr. Fisher, the doctor who saw Theresa Luke on the one occasion. Pardon? He saw her for a tick. Yes, Your Honor. But we have the, and again, again, we're here on summary judgment. We're not asking you to weigh the evidence. But there was the declaration of Dr. Phyllis Hollendeck who said that there was a breach of the standard of care by Dr. Fisher. Now, I would agree that there is a case, because what does Dr. Fisher see? That was the second time Theresa Luke was in the clinic office. He was there, or she had been there. There was the referral from the district court for the anti-abuse. There was the anti-abuse questionnaire and presumably a copy of the prescription. Well, is it undisputed that she presented herself for a tick, though? Yes. All right. Then I guess what is, if it's undisputed that she presented herself for a tick, the standard of care would have to be that you have, when you treat someone for a tick, you've got to also review every medication for any other possible. I'm not saying every medication from day one, Your Honor. We are saying it's reasonable to look at why is that patient there. He would see from the absence of any other record. Why was she here before? You expect doctors to look at the chart and say, what was this patient's immediate previous history? It's there for anti-abuse. And again, if the standard, as we presented it is, is that you do baseline blood studies and then follow it up by studies two to four weeks later and then a month after that, he would see that there is no baseline CBC to see liver enzymes. There is no follow-up because there is just a dearth of a chart. We're not talking about a two-inch chart here. We're talking about an absence of any information of follow-up care for the anti-abuse treatment. We do have a declaration, and again, I point out, is that we're here on a summary judgment. We want to at least, you know, I'm saying that this is a triable issue, that there is a material issue of fact. That's a weaker issue than your other issue. Yes. What about the pharmacy? Has Washington overruled McKee or abrogated the learned intermediary doctrine? Terhune is still recognized as applicable law. There has not been any overruling of McKee. However, I would point out that McKee, by its very nature, is a dispensing pharmacy case. And then in their own decision, they say, our holding is very narrow. Now, it's our position, Your Honor, is that with the WAC provisions that have been enacted and modified on two separate occasions after McKee imposing a duty upon the pharmacist to counsel the patient, shall counsel, is that that imposes, I think that's where we have a question as to whether or not McKee applies as broadly as the defendant suggests. We believe that it does not, and that we are in a different situation than McKee with the exception of, is there an issue of fact on the patent error where it said three times a week versus PRM, that there's an inherent ambiguity there. That fits in under McKee, and that was by, again, by Mr. Fehman, a toxicologist pharmacist. So we believe that we have an issue under McKee as it stands on a patent error. But we didn't get into the situation that was never addressed or encompassed in McKee where the pharmacy on 36 separate occasions mixes up the antibuse and administers the drug. And in this situation is that we believe that there are expanded duties, especially in light of the WAC, and that this, and that McKee does not cover this situation. And hence, we believe is that given the, it's traditionally the responsibility of the State of Washington to control, regulate the practice of this Court to certify that question to the Washington Supreme Court to see if McKee is still good law and whether it extends to this situation at hand of an administering physician. We believe that there has been sufficient changes to raise serious questions and doubt as to whether McKee applies, notably the WAC provision. And do you want to save me time for rebuttal? Yes, Your Honor. All right. Please support. Counsel, good morning. My name is Janet Schraer, and I represent the clinic defendants in this matter. Now, there's two of you here. So how are you going to divide your time? We're going to divide our time. I'm going to have 13 minutes and 7 minutes for co-counsel for the pharmacy. Okay. Would you be the appropriate one to talk about the objections on the expert declarations? Yes. That's solely my issue on behalf of the clinic defendants, and I'm glad you raised that. It's an unusual posture. Can I cut off your name? Did you say your name yet? Oh, Janet Schraer. I think I jumped in. Okay. Thank you. It's an unusual posture in that we made objections in the trial court after the doctor came in. Our reply brief, starting at page 107 of the SCR and goes on for six or seven pages, makes objections to the documents, both the experts that had not been disclosed at all, Dr. Feyman and Dr. Corliss, as well as the shift in position between the expert disclosures and the declarations that came in. We objected to all of that. And while the trial court, there was no oral argument in this case. Many times these kind of things are dealt with at oral arguments. But there's no ruling. So what am I doing? What is my record here? There's no ruling. I think you need to treat this as if there were a ruling granting the motion to exclude those newly brought, newly disclosed matters. But if you grant the motion to exclude, I mean, the court would have had to go through some reasoning process and ---- Well, I think on this record, in the plaintiff's opening brief, if you read their brief, the basis of the error that they contend is that the trial court didn't take into consideration our materials. I think in the way the rule reads, it's quite clear that they were supposed to have been excluded under the rule. I do believe it's an automatic exclusion under the rule. Isn't that discretionary? Because if they can show that it wouldn't prejudice you, then they would be able to have them admitted. Exactly. I mean, there is a process that goes on. I can't tell what the court did. But to get back to the previous questions, I believe it was Judge Canby who asked, well, what did you do, plaintiff, at the trial court to bring your response to that to the court's attention? They didn't oppose our request that the matters that were new and the experts that were new be excluded. They did not bring to the trial court's attention that they had substantial justification. They didn't have an opportunity because you raised it in your reply, and that closed a briefing, and he didn't have a rule argument. Well, you asked for it. A, first of all, in practice, that simply happens. People just file a brief responding to objections because it's a new matter. But as a practical matter, you need to respond. Oh, when I was a district judge. You ask permission. I mean, this is something that's a big deal. We're asking, and essentially it's a win-lose. If the court accepts the new material, I think it's a denial of the summary judgment. If the court does not accept the new material, it is a grant of the summary judgment. And when it's that ---- So are you conceding that if the new material was properly considered, summary judgment should have been denied? I think that's correct. If those are properly ---- It does raise an issue of fact, the new material. I think, yes, I think it does on the first issue with regard to P.A. Goodwin. However, it's clear the court did not look at those and should not look at those because under Rule 37 ---- I mean, it's clear just from the ruling? Well, the way the rule reads, it says that a party that without substantial justification fails to disclose information required by Rule 26. I know that. That's what your fella had said so, but you don't know whether they can assert substantial justification because they didn't have the opportunity to. You know, there was no motion to strike where they could have briefed the motion and say, well, we have substantial justification. Well, they could have requested for the court to provide that, and the undisputed fact is they did not provide substantial justification. I'd like to bring the Court's attention to the ---- I think it's called the Thingston case, which is a Ninth Circuit case. And in that case, the parties were attempted ---- it was, again, this kind of situation in which the Court did not rule on objections to materials in Rule 56 affidavits in support of a summary judgment. And the Court said that a party must either move to strike an affidavit or otherwise lodge an objection in the district court. So either one. And in this case, we did bring the objection to the trial court's attention. And this Court did consider the objections that were made when looking at the materials. And I would submit to that you should ---- Kennedy, was that a case where the district court made no ruling? Correct. The district court made no ruling. And the Plaintiffs' Counsel attempts to distinguish this because it's a hearsay issue. And I submit whether it's a hearsay issue or whether it's a discovery violation is a distinction without a difference. The case nonetheless applies. And you can apply the same legal test the trial court would have. You're here on do no rule review and make a determination under Rule 37 whether it ought to have been excluded. Because Plaintiffs' Counsel did not take the opportunity to bring to the trial court why the Rule 37 requests to ignore those new materials, because they didn't bring that to the trial court's attention, there is no basis upon which to receive the newly disclosed materials here. I want to talk a little bit about why that's the case, why the newly disclosed materials are important in the underlying case. In the materials in the disclosures, the experts stated that you should do baseline testing to see if there's elevated liver function, and probably those would not have been elevated, the experts said. But then you follow up and do tests within two to four weeks after that. And if there's nothing within those tests within two to four weeks, you don't do anything for six months. By that time, the horse was out of the barn. They said that the basis for the opinion is that with all drugs physicians monitor for liver toxicity, if a patient is going to have an idiosyncratic reaction, which is what plaintiffs had, it's usually within two to four weeks of initiating the drug. That's why the standard of care is to perform the liver function studies initially and again within two to four weeks. So in the two-to-four-week window, our argument was, if you saw them in the first two or three weeks, it could well have been within the standard of care, showed nothing, and until the fourth week, it wouldn't have shown up, according to their experts, and therefore, defendants went on causation. What they brought in at the last minute after the disclosure time and for the first time on summary judgment was the 10-day thing. Now the experts come in and shift their position entirely and said that if the, the liver function tests had been done, any time beginning 10 days after the prescription of anabuse, it would have shown elevated, more probably than not, elevated liver function tests. So clearly, we were harmed by their shift in position. Clearly, there's a distinction here. They claim they would have clarified. It's just a plain old change in position. It's a contradiction of the prior testimony, and I submit that. Now, the original position is that the standard of care would be to give a test after two weeks, or? The standard of care is to give the test within two to four weeks, is what we're saying. Two to four weeks. And the evidence in the original declaration was that that would be how likely would that be to show an elevated test? Well, the switch was when would the elevations have shown. They didn't switch position about the standard of care was to do the testing within two to four weeks. Their shift in position was, first, they said it would have shown elevated within two to four weeks. That's the likely time. That's why two to four weeks is the standard of care. Then they come back on the new stuff, and in the new, in the declarations in opposition to summary judgment, they said it would have shown up at 10 days. I understand. But my question goes to the first one, to the two to four weeks. What was the likelihood that it would show? What was the, their best evidence of the likelihood that an elevated problem would show in two to four weeks? The only thing they said was more likely than not. I don't believe anyone put a finer point on it than that. So why isn't the testimony of the experts before this, supplemental ones, that the medium for developing elevated liver enzymes after using anti-abuse is 30 days sufficient to create a genuine issue of triable effect? Why wouldn't that be enough? I'm sorry. Could you? Well, if we just use their, without the supplemental, if we use 30 days, why wouldn't that be enough to create a genuine issue of triable effect, that elevation would show within 30? Within 30 days. Because if the standard of care is within two weeks to four weeks, and he sees them within two to three weeks, then you could still comply with the standard of care. And any time between that time and the 30 days, it might not show up, and she still would have had the same injury. So that was the point of all that. So I believe there's a clear contradiction. The underlying materials in the first instance clearly demonstrated there was no causation, and they really haven't argued otherwise. And if those are excluded, then summary judgment was correctly granted. On the informed consent issue, our position is that catastrophic liver failure alleged by a plaintiff is so rare as a matter of law, no warning or disclosure of that risk was required. The parties ---- Well, what about the point your opponent mentioned about the one-in-four probability of, you know, some kind of liver damage? I have two responses to that. Number one, they did not argue that at all at the trial court level. That's not an argument that was raised, and therefore, they have waived that argument for appeal. Second of all, that's not the risk that they're alleging. That's not the risk that we're here to talk about in this lawsuit. The risk that they have been alleging is the fact that there was hepatitis and fulminant complete liver failure requiring a liver transplant. They're not here to talk about liver ---- elevated liver function tests. That's not the injury that they're claiming damages for. And hence, we think the risk to be focused on, and clearly that has been focused on previously, was the one-in-25,000 risk that their expert assessed, and the risk went up to one-in-40,000 with other experts. Well, except that if the patient were informed of that risk, you know, there might have been a different reaction, a different, you know, maybe non-consent. Doesn't that go to informed consent? Well, this is a diversity case, and we're to look at Washington law. And under Washington law, the primary case about this issue that I think you should focus on is the Ruffer case. And in the Ruffer case, the ---- it had to do with perforated bowel in the sigmoidoscope procedure, and the risk of that happening was one-in-25,000 or one-in-20,000, excuse me. And the Washington Supreme ---- the Washington Court of Appeals, review denied, rejected the view that plaintiff must be advised of every risk, and specifically held that as a matter of law, that was not a risk. That was material under the informed consent statutes that exist in Washington, and it needn't have been disclosed. Plaintiff attempts to distinguish that case, saying, well, in that case, the risk of one-in-20,000 came from the defense expert, and plaintiff didn't put on the expert testimony. Well, again, that's a distinction without a difference. Here, we're going with plaintiff's expert. He's the one who said it's a one-in-25,000 risk. And we think the Ruffer case applies. And as a matter of law, this is not a material risk of which she needed to be advised. Another part of the test that plaintiff didn't address ---- oh, I need to go faster. I'm sorry ---- is the fact that under Washington law, it's a ---- materiality is whether a reasonable person in plaintiff's shoes would have considered that risk to be material. This is a plaintiff in very specific shoes. Plaintiff testified. You recall how she got here. She had a dewey, and the court ordered she undergo anti-abuse treatment, or she was going to go to jail. So when you're combining the one-in-25,000 risk of the fulminant liver failure and the fact that plaintiff believed she had no choice to either undergo this or to go to jail, and the record reveals she has two small children at home, again, as a matter of law, looking at this particular plaintiff and her circumstances, a reasonable person in her position would not have found it material. So those two reasons we believe it's not a material risk. And we would ---- All right. If your counsel has any time left, then you can use it. Okay. All right. Thank you very much. Good morning, Your Honors. I'm Juliet Hanna, the attorney for ---- Why don't you say that again right in the mic, because that's how we record. Joanne Henry, attorney for Appellee High School Pharmacy. This is a diversity case governed by Washington law, and Washington law is McKee v. American Home Products. The case was decided in 1989. I think we're familiar with that. His point is that the counseling requirement that comes that he subsequently argued, how does that ---- how should we look at that? Attention to McKee, footnote 7, where they quote from ---- In McKee? In McKee, footnote 7. They quote quotes from WAC 360-16250, which specifically requires the pharmacist to orally explain the directions for use and give any additional information necessary to assure proper use of the drug. That was merely recodified in 1992 as, if I can find my site, WAC 246-869-220. So there was no change in the law between McKee and 1992. In 2001, it was changed slightly to, under the same citation, to change it to counseling from explaining. But if the Court will look at the language of those two sections, you'll find that there's no material change. The pharmacist all along has had that view. And the Key Court points out that instructions for use is not risks, it's not side effects, it's directions, whether to take it on an empty or full stomach, what activities to avoid, what substances to avoid. The other point that counsel made was trying  McKee's holding that there is no duty to warn of side effects as a patent error in the instructions. And we contend that that is simply trying to get an end run around a clear holding. The instructions do not need to include all of the warnings from the PDR. In fact, McKee pointed out that the PDR is directed to doctors and not pharmacists, and that the doctor, as the learned intermediary, which is still the law in Washington, has to filter that information. The argument that Mr. Goodwin's writing the prescription on a PRN basis, which simply means refills as needed, was a patent error. That's a direct conflict with McKee. McKee discussed that the length of time that a patient should take a particular medication is solely the doctor's lookout. Antabuse is not a restricted drug, so allowing refills, PRN, is not an error, and it's not a patent error. Certainly not a patent error. We've cited a couple of out-of-state cases. There's very few cases on this patent error discussing what kinds of things are patent errors. That's things like obviously excessive doses or the case where the pharmacist filled a prescription for a drug that was to be intermuscular injection when it was only approved for intravenous injection. Let's see. The other argument that had been made, in fact, every argument in this case except one, was raised and rejected in McKee. The only difference in this case from McKee is the fact that plaintiff took her antabuse prescription at the pharmacy. That doesn't raise any material issues, because there was no evidence, not even any contention, that there was anything wrong with how it was mixed, what happened. In fact, the evidence is that it was not. Our evidence was not. Well, I think the argument Mr. Golden is making is, I mean, he calls that the pharmacist administering the drug. Right. And so when the pharmacist administers the drug, it gives rise to some kind of duty of care, which is not covered by McKee. Right. Well, and the question here is that no duty that we assumed, we did assume the duty to take the pill out of the bottle, mix it with the tang, and the pharmacist washed or drank it. There's no evidence that that assumed duty had any relation to her injury. The evidence was that the drug was dispensed in a bottle with her name on it, just as it would be if she took it home. The bottle was put on the shelf. When she came in, her bottle was taken down, one pill was removed, mixed with the liquid, and she drank it. There's not a scintilla of evidence that that had anything to do with the injury in this case. If there were an allegation or evidence that there was something wrong with the administration, that it had been mixed and she'd been given three pills instead of one, or that the liquid it was mixed in somehow enhanced the toxic effect, it was just some kind of a powdered – well, she referred to it as tang, some kind of a powdered fruit drink. I could – certainly there could be a situation where a pharmacy administered a drug and there would be an issue that that assumed duty had something to do with the injury. That just simply is not the case here. And I will yield the rest of my time, unless the Court has other questions. Ms. Kagan. All right. There don't appear to be additional questions. Thank you. I don't want to tell you how to use the rest of your time, but you might want to quickly address Dr. Fischer. That's what I was going to do. So the last of the three issues has to do with the Dr. Fischer summary judgment, which is a separate claim from the other two claims that I talked about before. Dr. Fischer saw the patient only one time. It was for a tick bite. It's undisputed that at that time the plaintiff was on anti-abuse, but she reported no problems having to do with anti-abuse. She said she didn't have any problems at that time. It was not a physical problem that she was presenting to Dr. Fischer with. She was only presenting with the tick bite and asking for care for that. In opposition, plaintiff presented an affidavit or a declaration of Dr. Hollenbeck, but there's no foundation for that opinion. It's a bare-bones type of opinion that he should have done something different and it was below the standard of care. There's no foundation. There's no reference to the standard of care to which she's referring. There's no basis for it. There was no literature for it. And it's simply a bare-bones personal opinion about what she thought should be done. And under Washington law, again, it's a diversity case. Under Washington law, a mere personal opinion is not sufficient. More is required under the Adams v. Richland Clinic case. So we believe that the trial judge was correct in granting the summary judgment as to Dr. Fischer. And, of course, each of these three are separate and independent. And so we would ask that if you don't grant or if you don't uphold the summary judgment on one ground, obviously, we're asking that you look at them separately. At the very least, partial summary judgment ought to be granted. And particularly as to Dr. Fischer, with regard to seeing her for a tick bite, we ask that that and all the other ones be affirmed. One other quick thing about the motion, whether we ought to have done a motion with regard to Rule 37. If you look at Rule 37, the first part of Rule 37c-1 that we're relying on says that you take that if there's new material, they shall not be permitted to be relied upon at a motion, at a hearing, or at a trial, at a hearing or on a motion. But the next sentence is important. It says, So they put those words in there, on a hearing and with a motion, for alternate sanctions. So I think we can assume they don't mean you need a motion or a special hearing with regard to the first sanction. It's an automatic sanction. So I would ask you to look at the wording of Rule 30, FRCP 37c-1, because I think those two independent sentences give you the answer to whether a hearing was required or something special. If plaintiff wanted to request to put more stuff in the record, they ought to have done so. Thank you. Kagan for your argument. Your Honors, with respect to the McKee case, in the two revisions of the WAC since the McKee case in 1989, there was never any incorporation of any of the modifying language in McKee on what are the limitations of the duties of the pharmacist. And, in fact, I submit that they were expanded. Subparagraph 3 of WAC 246-869-220 says, For each patient, the pharmacist shall determine the amount of counseling that is reasonable and necessary under the circumstances to promote safe and effective administration of the medication and to facilitate an appropriate therapeutic outcome for that patient from the prescription. When there is a 1 in 4 chance of liver injury. You're not saying that overrides the learned intermediary doctrine, are you? No, I'm not saying that it overrides learned intermediary, because I believe that they can successfully coexist. How does a pharmacist order a test? Under the WACs, the pharmacist does have authority to order a blood test. That's undisputed. That's in our briefing, Your Honor, that they do have that authority. It's rarely used. But in this situation, they could at least call up the doctor and say, Hey, can you order a test? You know, is that there is, they can coexist here. The pharmacist should know that 1 out of 4 cases or that there is injury, serious injury with this drug, and that there is a need for baseline testing. That's in the PDR. So if they aren't going to do it, they should be in contact with the pharmacist. Now, back to the clinic, you know, is that we did not waive any issues. And on that question of whether or not you made no argument to the district court, either that your failure to comply was substantially justified or that it was harmless. You made no such arguments to the district court. So if you didn't make it there, you must have waived it. That's your argument. You just snuck it in. I mean, you just no, we didn't. I beg to differ, Your Honor, is that the evidence of whether there was 1 in the 4 incidents of liver injury and altered liver function studies, whether there was a 1 in 25 chance of the ultimate progression of the disease, that is in two declarations, Dr. Saxon and Dr. Rabkin. There is no ambiguity between the two of those, between their designations and their declarations. And the declarations were timely filed. They're objecting really to the content in trying to find some procedural ground for the court, as they concede, with established material issues of fact. The issue of the issue Let me ask this question. If we were to remand this case to district court to clarify this issue, whether or not it's considered those Hong Kong Lake declarations legitimate, and whether they should have, you think you can make an argument that they were properly filed? Absolutely, Your Honor. And again, is that if it's remanded, I cannot see any prejudice, because we don't have a trial date. And when we're talking about remanding, Your Honor, is that I believe is that, you know, is that the court can defer to the Supreme Court on the McKee issue for certification. It does not have to. You have the authority to remand with a reversal in our favor, if you wish, with clear instructions to the court. But we were, out of an abundance of caution, is that since this is an issue that's typically within the province of the Supreme Court, and it involves, I think, an unsettled area of Washington law, that is why we ask for certification. All right. Your time has expired. Yes, Your Honor. This matter will stand submitted. The court is going to briefly recess, so we'll come out and handle the last matter between 5 and 10 minutes.
judges: Canby, Tashima, Callahan